# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America<br><br>v.<br><br>1. Ede Guadalupe Jimenez Portillo,<br>2. Vicente Munoz Nunez,<br>3. Axel Ramon Acosta Cota,<br>4. Yordy Guadalupe Lopez Herrera, and<br>5. Jesus Adan Renteria Acosta. | CRIMINAL COMPLAINT<br><br>CASE NUMBER: MJ-23-04311-PCT-CDB |

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

On or about the date described in Attachment A in the County of Navajo in the District of Arizona, the defendants committed the crimes of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659, and Possession of a Firearm by an Alien Unlawfully Present in the United States, in violation of Title 18 U.S.C. §§ 922(g)(5) and 924(a)(8) offenses described as follows:

**See Attachment A, Description of Counts**

I further state that I am a Special Agent for Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

**See Attachment B, Statement of Probable Cause, Incorporated by Reference Herein.**

Continued on the attached sheet and made a part hereof:   ☒ Yes   ☐ No

AUTHORIZED BY: Addison Santomé, AUSA   *ADDISON SANTOME* (Digitally signed by ADDISON SANTOME, Date: 2023.11.20 14:46:52 -07'00')

Chris Foster, SA for HSI
Name of Complainant

*CHRISTOPHER E FOSTER* (Digitally signed by CHRISTOPHER E FOSTER, Date: 2023.11.20 15:22:37 -07'00')
Signature of Complainant

Sworn to telephonically before me

_____   at   Flagstaff, Arizona
Date                                      City and State

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge
Name & Title of Judicial Officer

*Camille D Bibles* (Digitally signed by Camille D Bibles, Date: 2023.11.20 16:43:50 -07'00')
Signature of Judicial Officer

**CC: USM & PTS**

# ATTACHMENT A
# DESCRIPTION OF COUNTS
## COUNT 1

**Theft from Interstate Shipment**

On or about November 16, 2023, in the District of Arizona, Defendants EDE GUADALUPE JIMENEZ PORTILLO, VICENTE MUNOZ NUNEZ, AXEL RAMON ACOSTA COTA, YORDY GUADALUPE LOPEZ HERRERA, and JESUS ADAN RENTERIA ACOSTA knowingly had in their possession goods and chattels, to wit: Insignia Televisions, of a value in excess of $1000.00, which had been stolen from a Burlington Northern Santa Fe train while moving in interstate commerce from California, to Arizona, knowing the said goods and chattels to be stolen.

All in violation of Title 18, United State Code, Section 659.

## COUNT 2

**Possession of a Firearm by an Alien Unlawfully Present in the United States**

On or about November 16, 2023, in the District of Arizona, Defendant VICENTE MUNOZ NUNEZ, knowing that he was an alien illegally and unlawfully in the United States, did knowingly possess a firearm, to wit: a Smith and Wesson Pistol, bearing serial number JDC3582, which had previously been shipped or transported in interstate or foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(5) and 924(a)(8).

## ATTACHMENT B

## STATEMENT OF PROBABLE CAUSE

I, Chris Foster, a Special Agent for Homeland Security Investigations (HSI), being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with HSI and have been so employed since December 1997. I have a Bachelor of Science in Criminal Justice from California State University Sacramento. I am a law enforcement officer of the United States, and I am empowered by law to conduct criminal investigations, make arrests, and serve search and arrest warrants.

2. As a Special Agent with HSI, your Affiant investigates criminal violations of United States law, including import and export violations, controlled substances law violations, and money laundering violations. Your Affiant has participated in hundreds of investigations involving stolen vehicle organizations, theft ring investigations, possession, manufacture, distribution, and importation of controlled substances, as well as methods used to finance drug transactions. As an HSI Special Agent, your Affiant has been trained in conducting narcotics and money laundering investigations and received specialized training concerning violations of the Controlled Substances Act contained within Title 21 of the United States Code. I am currently assigned to the HSI Flagstaff Office located in Flagstaff, Arizona, where we investigate transnational criminal organizations to include money laundering and drug trafficking organizations operating throughout the United States.

3. By virtue of my employment as a Special Agent, your Affiant has performed various tasks, which include, but are not limited to:

    a. functioning as a surveillance agent, thus observing and recording movements of persons involved in violations of United States Code as well as violations of Arizona State law;

b. interviewing witnesses, confidential reliable informants (CIs) and sources of information (SOI) relative to the violations of United States Code as well as violations of Arizona State law;

c. functioning as a case agent, entailing the supervision of specific investigations involving various crimes throughout the United States; and

d. conducting complex investigations involving transnational criminal organizations committing various crimes throughout the United States.

4. I have consulted with other experienced investigators concerning the practices of transnational criminal organizations and the best methods of investigating them. In preparing this affidavit, I have conferred with other Special Agents and law enforcement officers. Furthermore, I have personal knowledge of the following facts or have learned them from the individual(s) mentioned herein.

5. The facts in this affidavit come from my personal observations, my training and experience, information obtained from other agents involved in the investigation, and information obtained from witnesses. Based on the below facts, your Affiant submits there is probable cause that Ede Guadalupe JIMENEZ Portillo, Vicente MUNOZ Nunez, Axel Ramon ACOSTA Cota, Yordy Guadalupe LOPEZ Herrera, and Jesus Adan RENTERIA Acosta committed the crime of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659, and Vicente MUNOZ Nunez committed the crime of Possession of a Firearm by an Alien Unlawfully Present in the United States, in violation of Title 18 U.S.C. §§ 922(g)(5) and 924(a)(8).

## BACKGROUND

6. Over the past fifteen years, several Transnational Criminal Theft Organizations have been burglarizing Burlington Northern Santa Fe (BNSF) Railway as well as Union Pacific trains throughout the Southwest of the United States to include Arizona. These organizations consist primarily of Mexican citizens from the Mexican

State of Sinaloa who operate out of Arizona and California, with extensive connections throughout California, Arizona, and New Mexico. The train burglaries have increased in frequency over the past two years.

7. The suspects usually scout high value containers on the BNSF railway on Eastbound trains that parallel Interstate 40 near Needles, California. Once the organization targets a particular train of interest, they typically find a location for several train burglars to get on the train. Once on the train, the burglars open container doors while the train is moving and target merchandise to steal such as electronics, tools, and footwear. The burglars often target containers with visible high-security locks and use reciprocating saws, bolt-cutters, or similar tools to defeat the locking mechanisms. Once the burglars target a specific container that has desirable merchandise, the burglars on the train communicate with follow vehicles utilizing cellular devices, and those follow vehicles surveil the train until it stops, or the burglars will cause the train to stop to unload the freight. The suspects often cut the train braking system air hose, which causes the train to go into an emergency stop (commonly referred to as "UDE"), which is a sudden and dramatic application of all the brakes on the train. By cutting an air hose, the burglars can control when and where the train is stopped to unload the cargo they target to burglarize. This act is very dangerous and can cause a train to derail, which could ultimately cause serious injury or death to BNSF employees or citizens. The suspects have also sabotaged the train signal system by cutting the locks off signal boxes and then by cutting the control wires inside. This is also a dangerous act that creates dark areas on the rail network, requiring non-traditional train dispatching functions and extensive repairs. High-value trains travel at speeds up to 70 MPH on multiple tracks in both east and west directions. The train crews and train dispatchers rely on the signals for safe transportation.

8. Once the burglars unload the merchandise from the container that is on the train, the burglars often hide the product in fields or brush adjacent to the BNSF tracks to conceal it until it can be picked up later. The location of the stolen merchandise is then

shared by the train burglars with the use of cellular devices to the surveillance crew who are following the train.  The organization will then send a U-Haul or box truck to pick up the stolen merchandise if law enforcement is not detected.  Once the stolen merchandise has been picked up, it is usually transported to California where it is sold or fenced to wholesale online retailers such as third-party Amazon and eBay resellers.

## CURRENT INVESTIGATION

9. On November 16, 2023, your Affiant learned from BNSF Special Agent (SA) Derrick Porter that a citizen of Winslow, Arizona, had called BNSF and reported that he/she observed what appeared to be several young males burglarizing a BNSF train. The citizen observed the males remove what appeared to be big boxes that were possibly television sets and hide them under a train bridge along the BNSF railway.  BNSF SA Porter told your Affiant that BNSF closed approximately 35 doors on different trains throughout the BNSF railway in Northern Arizona that were not opened by BNSF.

10. Your Affiant knows that open doors on containers on the BNSF trains are a direct result of unauthorized individuals accessing the containers on the BNSF train. Your Affiant knows these trains travel from California to Arizona.

11. On November 16, 2023, at approximately 12:30 p.m., your Affiant located the train bridge.  SA Virginia Foster covertly looked under the train bridge and observed approximately 35 Insignia 55-inch televisions stacked in various places underneath the south side of the train bridge.  The MSRP value of each television is approximately $350.00.

12. At approximately 8:00 p.m., your Affiant learned that there were four suspects moving the televisions from the train bridge to another location.  Over the next thirty (30) minutes, the suspects made approximately 11 trips from the train bridge to a brush line near a roadway that would be accessible by a vehicle.  The four suspects then went back to the train bridge and hid out of view.

13. At approximately 8:51 p.m., your Affiant learned that the four suspects appeared to have left the train bridge and went to the 29th BNSF train car that had stop near the train bridge and appeared to be accessing containers on the train; however, no visible merchandise was observed being removed from the train.

14. Your Affiant knows that train burglars open container doors on resting trains until they find merchandise such as electronics, tools, and footwear. If those items are not located, they usually do not remove any items from the container.

15. At approximately 9:00 p.m., your Affiant learned there were unrelated lights on the Northside of the train bridge that might have been headlights or flashlights, and the four suspects immediately ran south and hid in the bushes south of the tracks. At approximately 9:07 p.m., the train they were previously on moved along the railway and away from the train bridge.

16. At approximately 9:27 p.m., your Affiant learned that a vehicle, later identified as a 2013 Jeep Grand Cherokee, arrived while pulling a small, enclosed trailer near the train bridge with one additional suspect.

17. Your Affiant learned that the four suspects along with the driver of the Cherokee loaded the televisions inside the Cherokee and the enclosed trailer for approximately the next ten (10) minutes.

18. Your Affiant learned that the four suspects then went back to the train bridge, and the Cherokee pulling the enclosed trailer departed the area while driving westbound through the neighborhood. At approximately 9:41 p.m., your Affiant observed the Cherokee pulling the enclosed trailer drive Southbound on Highway 87 in Navajo County, Arizona.

<u>Ede Guadalupe JIMENEZ Portillo</u>

19. At approximately 9:45 p.m., your Affiant observed a traffic stop initiated on the Cherokee, away from the train bridge where the four suspects were hiding. The traffic stop resulted in the arrest of the driver and sole occupant of the Cherokee while in

possession of approximately 30 Insignia televisions within the enclosed trailer and within the Cherokee.

20. The driver was identified by a Mexico passport as Ede Guadalupe JIMENEZ Portillo (JIMENEZ). Task Force Officer (TFO) Carlos Leyva asked JIMENEZ if there was anyone else in the vehicle and JIMENEZ stated in Spanish, "I want to be honest and tell you the truth, the car is full of televisions that we took from the train."

21. HSI SA Tazten Starnes and TFO Leyva attempted to interview JIMENEZ. After being read his *Miranda* rights in Spanish, JIMENEZ asked for an attorney. No further questions were asked of him. This contact was recorded.

22. JIMENEZ was born in El Fuerte, Sinaloa, and based on Department of Homeland Security (DHS) records, JIMENEZ has never been encountered and appears to be illegally present in the United States.

23. At approximately 10:24 p.m., your Affiant learned the four suspects again jumped onto another stopped train near the train bridge, and once again were opening containers. They appeared to be opening the 21st, 22nd, and 23rd containers on the train; however, no merchandise was observed being removed.

24. At approximately 12:32 a.m. on November 17, 2023, your Affiant observed unrelated headlights near the BNSF railway, and learned at the same time as the headlights emerged, all four suspects ran from the train bridge to a nearby brush line and appeared to hide. Your Affiant learned the four suspects departed the adjacent brush line after several minutes and went back to the train bridge.

25. At approximately 1:20 a.m., your Affiant along with other agents went to the train bridge and encountered the following four individuals:

<u>Vicente MUNOZ Nunez</u>

26. Agents encountered Vicente MUNOZ Nunez (MUNOZ), but during his arrest, he attempted to flee. MUNOZ was found to be in possession of a loaded Smith and Wesson pistol (serial # JDC3582) along with two additional loaded magazines.

27. The Smith and Wesson pistol had been manufactured outside of the State of Arizona.

28. MUNOZ was born in Ahome, Sinaloa. There is no record of MUNOZ crossing in or out of the United States, nor is there any record of MUNOZ ever lawfully applying for admission into the United States.

29. SA Starnes and TFO Leyva attempted to interview MUNOZ. After being read his *Miranda* rights in Spanish, he invoked. No further questions were asked of him. This contact was recorded.

### Axel Ramon ACOSTA Cota

30. Agents also encountered Axel Ramon ACOSTA Cota (ACOSTA). ACOSTA was born in Choix, Sinaloa. There is no record of ACOSTA crossing in or out of the United States, nor is there any record of ACOSTA ever lawfully applying for admission into the United States.

31. SA Starnes and TFO Leyva interviewed ACOSTA. After being read his *Miranda* rights in Spanish, he agreed to speak with law enforcement. The interview was recorded.

32. ACOSTA confirmed his birthdate and that he was born Choix, Sinaloa. Additionally, ACOSTA provided his phone number. ACOSTA said that he is currently in the United States illegally. ACOSTA said that he currently resides in Mesa, Arizona, and he has been working as a landscaper. ACOSTA stated that he came to Northern Arizona to "work". When questioned, ACOSTA said that he came up to "do the train stuff." After asking for further explanation, ACOSTA admitted that he came up to burglarize containers on trains.

33. ACOSTA stated that a male drove him and the other three that were arrested to Northern Arizona, and the male gave him some money and told him to use his identification and the cash to check into Motel 6. ACOSTA said that he went to the Motel 6 in Flagstaff, Arizona, and registered the motel room under his name and he paid for the room in cash. ACOSTA stated that they were staying in room 103. Your Affiant later

learned Axel Ramon ACOSTA Cota checked into the Motel 6 using his name and had room 131.

34.   ACOSTA stated that they went to the train bridge in Winslow, Arizona, and were there to burglarize the trains when they stopped. ACOSTA said that around 10:00 p.m. on the night before he was arrested, he used bolt cutters to open a train container that had televisions. It should be noted that after the above arrests, your Affiant recovered a pair of bolt cutters.

35.   ACOSTA said that all four individuals that were arrested helped offload the televisions and placed them under the train bridge. ACOSTA stated that after they offloaded the televisions, they left the area and went back to the Motel 6. ACOSTA said that when they returned to the train bridge some of the televisions that they had offloaded appeared to be missing but the majority of them were still there.

36.   ACOSTA said that they moved the televisions from the train bridge to a bush, and a short time later a small SUV towing a box trailer arrived and they loaded the televisions into the box trailer and SUV. ACOSTA stated that he did not know the driver of the SUV and did not see him well because it was dark. ACOSTA said that the driver of the SUV told them to load the televisions. ACOSTA stated that the man with the gun, who was identified as Vicente MUNOZ Nunez, was the one in charge of all of them that were arrested because he was making all the phone calls and coordinating.

37.   ACOSTA said that he knew he was going to be paid for burglarizing the train containers but did not know how much or when he was going to be paid. ACOSTA said that a brown or tan in color Chevrolet Tahoe drove them to Winslow, Arizona.

### Yordy Guadalupe LOPEZ Herrera

38.   Agents also encountered Yordy Guadalupe LOPEZ Herrera (LOPEZ). LOPEZ was born in Hermosillo, Sonora. There is no record of LOPEZ crossing in or out of the United States, nor is there any record of LOPEZ ever lawfully applying for admission into the United States.

39. SA Starnes and TFO Leyva interviewed LOPEZ. After being read his *Miranda* rights in Spanish, he agreed to speak with law enforcement. The interview was recorded.

40. LOPEZ provided his birthdate and confirmed he was born in Hermosillo, Sonora, but living in Guasave, Sinaloa. Additionally, he provided his phone number. LOPEZ said that he is currently in the United States illegally. LOPEZ said that he currently resides in Mesa, Arizona. LOPEZ only knows one of the individuals that was arrested with him. He only knows "Jesus," who was identified as Jesus Adan RENTERIA Acosta. LOPEZ said that he knows Jesus as "Guerro."

41. LOPEZ said that he came from Mesa, Arizona, to Northern Arizona with the purpose of opening train containers and stealing the products within. LOPEZ stated that they arrived in Winslow, Arizona, on Tuesday, November 14, 2023, and stayed at a motel, but wasn't sure which motel. LOPEZ stated that the person that he spoke with and arranged for him to come to Northern Arizona, was only ever spoken to on the phone. LOPEZ said that the person he spoke to on the phone was not in Northern Arizona with them. LOPEZ stated that the man on the phone told him to be careful on the trains and they were going to Northern Arizona to break open the latches on the train. LOPEZ stated that he was going to be paid $200 per day to burglarize the trains.

42. LOPEZ stated that yesterday (November 16, 2023), a white car dropped him and the other three arrested people at a motel in Winslow, Arizona. All four of them were getting on trains and cutting locks with bolt cutters. LOPEZ claimed that he cut three or four train container locks. LOPEZ said that one container was full of Yoplait yogurt, one had flour or wheat, and one had rice packets. LOPEZ stated that he took some of the Yoplait yogurt off the train container and ate it.

43. LOPEZ claimed that he was not associated with taking the televisions from the train container but did admit that he helped move the televisions from under the train bridge to the brush and then into a box trailer pulled by a small SUV that showed up. Later in the interview, LOPEZ admitted that he and the other three guys removed the

televisions off the train container and placed them under the train bridge the day before getting arrested. LOPEZ claimed that he did not know who cut the locks on the train container to access the televisions.

44. When asked about who was in charge, LOPEZ stated that "Chapito," the one with the gun, was in charge and appeared to have more experience than anyone else.

45. When asked about the motel that they stayed in, LOPEZ stated that the day they were arrested that they were in Payson, Arizona, and they were in Winslow, Arizona, on Tuesday, November 14, 2023. While questioning more about his movement, LOPEZ was a little confused at times about locations he was at. He said that they drove more than 20 minutes but less than 1 hour to get to Winslow, Arizona earlier. LOPEZ stated that they did not have permission to take merchandise off the train containers, and he knew it was wrong and illegal to take the merchandise off the train containers. LOPEZ claimed that this was his first time burglarizing trains or being associated with train burglaries.

### Jesus Adan RENTERIA Acosta

46. Agents also encountered Jesus Adan RENTERIA Acosta (RENTERIA). RENTERIA was born in Choix, Sinaloa, and based on DHS records, RENTERIA was previously deported and appears to be present in the United States illegally.

47. SA Starnes and TFO Leyva interviewed RENTERIA. After being read his *Miranda* rights in Spanish, he agreed to speak with law enforcement. The interview was recorded.

48. RENTERIA provided his birthdate and confirmed he was born in Choix, Sinaloa. Additionally, he provided his phone number. RENTERIA said that he is currently in the United States illegally. RENTERIA said that he currently resides in Mesa, Arizona.

49. RENTERIA stated that he arrived in Winslow, Arizona, from Mesa, Arizona, on November 16, 2023, at around 7 or 8 p.m. RENTERIA said that he does not know who drove them to Winslow, Arizona, but they were driven in a four-door sedan.

50. RENTERIA stated that he knew about the televisions and knew that the purpose of the trip to Winslow, Arizona, was to pick up televisions hidden near the train tracks that were taken off a train by another group, and they were responsible for loading the televisions into a vehicle that was going to arrive nearby. RENTERIA also said that he knew the purpose of the trip was not only to load the televisions that were already stolen from train cars, but also for them to rob additional trains as well.

51. RENTERIA was asked about who else was with him, and he stated that there were four of them that were dropped off and he only knew one of the other three guys through his work. RENTERIA was asked if he was going to be compensated for the work he was doing, and he responded that he was going to be paid but wasn't sure how much or when.

52. RENTERIA stated that the guy with the gun, who was identified as Vicente MUNOZ Nunez, was the one making phone calls and giving them instructions. RENTERIA said that he doesn't know why MUNOZ had a gun.

53. RENTERIA said that they had a bolt cutter tool that was used to cut the locks off the train cars to gain access to the freight. RENTERIA stated that before they were caught all four of them moved approximately 30 televisions from under the train bridge to a bush, and a short time later a vehicle pulling a box trailer showed up. RENTERIA said that they all loaded the televisions into the box trailer and small SUV pulling the box trailer. RENTERIA stated that after the televisions were loaded, the small SUV and box trailer departed, and they went back to the train bridge.

54. RENTERIA said that while they were at the train bridge, they stayed underneath the train bridge to be hidden, and when a train would stop on the train bridge the other three people would go up to the train and open the containers to see what was in them with the intent to steal more property. RENTERIA stated that he knew it was wrong and illegal to take the property off the train containers. RENTERIA claimed that this was his first time burglarizing trains or being associated with train burglaries.

## CONCLUSION

55. For these reasons, your Affiant submits that there is probable cause to believe Ede Guadalupe JIMENEZ Portillo, Vicente MUNOZ Nunez, Axel Ramon ACOSTA Cota, Yordy Guadalupe LOPEZ Herrera, and Jesus Adan RENTERIA Acosta committed the crime of Possession or Receipt of Goods Stolen from Interstate Shipment, in violation of Title 18, United States Code (U.S.C.) § 659, and Vicente MUNOZ Nunez committed the crime of Possession of a Firearm by an Alien Unlawfully Present in the United States, in violation of Title 18 U.S.C. §§ 922(g)(5) and 924(a)(8).

56. I declare under penalty of perjury under the laws of the Unites States of America that the forgoing is true and correct.

**CHRISTOPHER E FOSTER**
Digitally signed by CHRISTOPHER E FOSTER
Date: 2023.11.20 15:22:37 -07'00'

CHRIS FOSTER
Special Agent
Homeland Security Investigations

Sworn to and subscribed telephonically this __20th__ day of November, 2023.

**Camille D Bibles**
Digitally signed by Camille D Bibles
Date: 2023.11.20 16:43:07 -07'00'

HONORABLE CAMILLE D. BIBLES
United States Magistrate Judge